TO: Clerk's Office
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

-v.-

CARLO ELOMINA GARCIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

23-MJ-00596
Docket Number

SUBMITTED BY: Plaintiff ___ Defendant ___ DOJ ✓
Name: AUSA John Vagelatos
Firm Name: U.S. Attorney's Office, E.D.N.Y.
Address: 271-A Cadman Plaza East
Brooklyn, New York 11201
Phone Number: (718) 254-6182
E-Mail Address: John.Vagelatos@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ___ NO ✓
If yes, state description of document to be entered on docket sheet:
_____
_____

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

Ongoing criminal investigation with defendant at liberty.

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn , NEW YORK
June 23, 2023

/s/ Cheryl Pollak

**HONORABLE CHERYL L. POLLAK**
**U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE June 23, 2023
                                                DATE

**MANDATORY CERTIFICATION OF SERVICE:**
A.) ___ A copy of this application either has been or will be promptly served upon all parties to this action, B.) ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: _____ ; or C.) ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

June 23, 2023                          /s/ John Vagelatos
     DATE                                  SIGNATURE

JPL:JV
F. #2021R00723

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| - against - | COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT |
| CARLO ELOMINA GARCIA, | |
| Defendant. | (T. 18, U.S.C., §§ 1347, 2 and 3551 et seq.) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    Case No. 23-MJ-596

EASTERN DISTRICT OF NEW YORK, SS:

NADEEM AFZAL, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

In or about and between May 2017 and June 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant CARLO ELOMINA GARCIA, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud one or more healthcare benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery and payment for healthcare benefits, items and services.

(Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for an arrest warrant for the defendant CARLO ELOMINA GARCIA (hereinafter "CARLO GARCIA" or "GARCIA").

2. I have been a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") since March 2017. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants, and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs and other health care benefit programs. As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals involved in criminal activity to facilitate various kinds of fraud and to conceal their activities from detection by law enforcement authorities.

3. Among other duties, I am currently participating in an investigation involving the Federal Bureau of Investigation ("FBI") and HHS-OIG into, among other things, violations of 18 U.S.C. § 1347 (health care fraud) by the defendant CARLO GARCIA. Specifically, the investigation is focused on a scheme involving the submission of false and fraudulent claims for reimbursement for occupational therapy services and procedures to Medicare, Medicaid and private insurers.

4. I am familiar with the investigation described below through my own participation in the investigation, discussions with other federal law enforcement officers, records discovered in the course of this investigation that have been reviewed by myself and

other law enforcement officers, interviews and surveillance conducted by myself and other law enforcement officers and my training and experience.

5. Except as explicitly set forth below, in this affidavit I have not distinguished between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because this affidavit is being submitted for the limited purpose of seeking an arrest warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts necessary to establish probable cause to support issuance of the warrant. Except where otherwise noted, all statements of others and documents described in this affidavit are set forth in part and in substance only.

## BACKGROUND

I. The Medicare and Medicaid Programs

6. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

7. The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as Medicaid "beneficiaries."

8. Medicare and Medicaid each qualified as a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

9. Medicare included coverage under two primary components, hospital insurance ("Medicare Part A") and medical insurance ("Medicare Part B"). Medicare Part B covered the costs of physicians' services and outpatient care, including occupational therapy, physical therapy, chiropractic services and diagnostic tests.

10. Medicaid covered the costs of medical services and products ranging from routine preventative medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid were occupational therapy, physical therapy and diagnostic tests.

11. Medical providers and suppliers that sought to participate in Medicare Part B and Medicaid, and to bill Medicare and Medicaid for the cost of their treatment of eligible beneficiaries and related benefits, items and services, were required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN") from each program. The PIN or PTAN allowed medical providers and suppliers to submit bills, known as claims, to Medicare and Medicaid and to obtain reimbursement for the cost of treatment and related health care benefits, items and services that they had supplied or provided to beneficiaries.

12. Medical providers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider was required to certify, among other things, that the services were rendered to the patient and were medically necessary.

13. Providers submitted claims to Medicare and Medicaid using billing codes, also called current procedural terminology or "CPT" codes, which were numbers referring to specific descriptions of the medical services provided to beneficiaries.

14. Medicare and Medicaid reimbursed providers for certain physical therapy and occupational therapy procedures. For certain of these procedures and claims submitted under CPT codes for private occupational therapy practices in New York, Medicare and Medicaid required that the services be provided by licensed occupational therapy professionals directly to one patient at a time, or "one-on-one."

15. For certain CPT codes, each unit represented 15 minutes of one-on-one time spent in patient contact ("15-minute timed codes"). For example, CPT code 97110 represented 15 minutes of occupational therapy requiring a professional, specifically "Therapeutic Exercise." If a beneficiary received a total of 60 minutes of "Therapeutic Exercise" on a given date of service, the provider would report and bill for four units of 97110.

16. While Medicare and Medicaid expected providers to perform an average of 15 minutes of one-on-one patient contact for each 15-minute timed code billed, they permitted providers to bill for units as follows:

| Total Number of Minutes of Services of 15-Minute Timed Codes | Total Number of Billed Units |
|---|---|
| 8-22 minutes | 1 unit |
| 23-37 minutes | 2 units |
| 38-52 minutes | 3 units |
| 53-67 minutes | 4 units |
| 68-82 minutes | 5 units |
| 83-97 minutes | 6 units |

Accordingly, if a provider billed for four total units of timed codes, even if they involved a combination of different timed services, Medicare and Medicaid expected that the provider had provided at least 53 minutes of one-on-one treatment.

17. Medicare, Medicaid and New York State regulations do not allow unlicensed individuals to provide occupational therapy services. Only licensed Occupational Therapists, or Occupational Therapist Assistants and students gaining experience for licensure under the supervision of, and with the on-site presence of, a licensed Occupational Therapist, are allowed to provide occupational therapy services.

II. The Defendant and Relevant Entities

18. The defendant CARLO GARCIA was a New York State licensed Occupational Therapist and the sole owner of Carlo E. Garcia Occupational Therapy, P.C. ("CG OT"), a New York corporation. From approximately May 2017 to June 2021, GARCIA and CG OT provided occupational therapy services at 108-25 63rd Avenue, Forest Hills, New York. GARCIA and CG OT were enrolled with Medicare and Medicaid.

19. CNS Physical Therapy & Acupuncture, P.C. was a New York corporation that owned the office at 108-25 63rd Avenue, Forest Hills, New York ("CNS"). CNS purportedly provided physical therapy to beneficiaries. Tae Jung Kim was the owner of CNS and a New York State licensed Physical Therapist and acupuncturist. On October 18, 2022, Kim pleaded guilty to committing health care fraud in violation of 18 U.S.C. § 1347 for fraudulently billing Medicare and Medicaid for physical therapy services. See United States v. Tae Jung Kim, 22-CR-343 (LDH), ECF Dkt. No. 28 (Minute Entry for Change of Plea Hearing).

20. From May 2017 to June 2021, the defendant CARLO GARCIA was the only licensed Occupational Therapist at CNS. GARCIA paid CNS approximately $12,000 per

month and 55% of any profits from occupational therapy services provided at CNS. In exchange for those payments, CNS provided GARCIA with physical space at CNS to offer occupational therapy services and CNS staff who provided receptionist and clerical services. Among other clerical services, CNS staff input and aggregated GARCIA's occupational therapy billing records into "superbills"[1] that were emailed to "COMPANY-1," a third-party billing processor, the identity of which is known to your affiant, that submitted CG OT's and CNS' bills to insurers, including Medicare and Medicaid.

III.     GARCIA's Submission of Bills to COMPANY-1

21.     On or about June 2, 2021, in a voluntary interview with law enforcement, the defendant CARLO GARCIA stated that he prepared the records of occupational therapy services provided and then provided the bills to a CNS employee to submit to COMPANY-1. GARCIA also told law enforcement that he contacted COMPANY-1 if he had any billing related questions and that COMPANY-1 notified him by e-mail if any claims were rejected by insurance.

22.     The defendant CARLO GARCIA stated that he had employed three unlicensed occupational therapist aides while at CNS. Nonetheless, GARCIA stated that the aides did not assist him in writing progress notes or performing any paperwork.

23.     Similarly, CNS and CG OT employees, whose identities are known to your affiant, have stated that the defendant CARLO GARCIA provided paper notes of services and CPT codes to be billed to the CNS staff. The CNS employees then input the paper notes into

---

[1]     A "superbill" contained a table listing beneficiaries and the number of units of occupational therapy services that the beneficiaries had received on a particular date of service.

the "superbills" and transmitted the aggregated billing information to COMPANY-1. Accordingly, GARCIA, together with others, submitted or caused the submission of reimbursement requests to Medicare, Medicaid and private insurers for occupational therapy purportedly provided at CNS's offices.

24.   In addition, the defendant CARLO GARCIA told law enforcement that all payments from insurers were deposited into his personal bank account. Based on my training and experience, and the investigation to date, GARCIA therefore would likely have had knowledge of all billings and reimbursements associated with his NPI number.

25.   In an interview with law enforcement, a confidential source ("CS-1"), who identity is known to your affiant[2] told law enforcement that at the end of each month, the defendant CARLO GARCIA and CNS' owner, Tae Jung Kim, would meet in Kim's office to discuss the revenue and profits from the occupational therapy practice.

## THE FRAUDULENT SCHEME

26.   From at least May 2017 through at least June 2021, the defendant CARLO GARCIA, together with others, engaged in a fraudulent scheme in which he submitted and caused to be submitted false and fraudulent claims for reimbursement for services that were not eligible for Medicare and Medicaid reimbursement, were not provided as billed, and/or were not provided.

---

[2]   CS-1 is a former employee of the defendant CARLO GARCIA who worked at CNS. CS-1 has provided information in the hopes of obtaining an economic benefit in a related civil lawsuit against CNS and Tae Jung Kim, but not GARCIA or CG OT, although no such benefit was promised or has been conferred. CS-1 has provided reliable information in the course of this investigation. CS-1's information has been corroborated by other evidence obtained during the course of this investigation, including, but not limited to interviews of other witnesses, records and video recordings obtained pursuant to a search warrant.

27. In or about and between approximately May 2017 and June 2021, the defendant CARLO GARCIA, together with others, submitted and caused to be submitted approximately $1,580,758 in claims to Medicare for occupational therapy services purportedly provided, and GARCIA was paid approximately $770,286 on those claims. Also in or about and between approximately May 2017 and June 2021, the defendant CARLO GARCIA, together with others, submitted and caused to be submitted approximately $2,327,121 in claims to Medicaid for occupational therapy services purportedly provided, and GARCIA was paid approximately $903,601. Many of these claims were fraudulently submitted as part of the scheme.

I.   Fraudulent Billing For Impossible Amount Of Services In A Day

28. The investigation to date has revealed that the defendant CARLO GARCIA, together with others, submitted or caused the submission of fraudulent bills to Medicare, Medicaid and private insurers that were factually impossible in that they claimed that GARCIA personally provided more than 24 total hours of direct one-on-one occupational therapy services in a single day. Notably, GARCIA told law enforcement in a voluntary interview that he worked from 10 a.m. to 7 p.m. Mondays-Fridays and 10 a.m. to 3 p.m. on Sundays.

29. On December 23, 2017, the defendant CARLO GARCIA, together with others, caused 10 "superbills" purporting to describe the occupational therapy services provided by GARCIA from December 12, 2017 to December 22, 2017 to be emailed to COMPANY-1. The December 23, 2017 email included a "superbill" for occupational therapy services purportedly provided by GARCIA to 30 patients on December 19, 2017. The "superbill" for all 30 of the patients stated that they had purportedly received at least four or five units of

"Tharapeutic [sic] Exercise ([CPT code] 97110)"; "Neurons MS Reeducation ([CPT code] 97112" (Neuromuscular Re-Education)"; "Therapeutic Acvtivities [sic] ([CPT code] 97530)"; and "Manuel [sic] Therapy ([CPT code] 97140)" (collectively hereinafter, the "Timed OT Services").³  As set forth supra at ¶¶ 15-16, the CPT codes billed for these Time OT Services assumed that the services were provided for 15 minutes on average.  Assuming that GARCIA provided all of the Timed OT Services for an average of 15 minutes per unit, GARCIA purportedly provided over 34 hours of one-on-one Timed OT Services on December 19, 2017.  That estimate does not include additional occupational services that were included on the "superbill", but for which Medicare and Medicaid do not require a set amount of one-on-one treatment time, such as Initial Evaluations and Reevaluations or Self-Care lessons.  GARCIA, together with others, ultimately billed Medicare approximately $5,560 and Medicaid approximately $3,240 for occupational therapy services that he purportedly provided on December 19, 2017, and was reimbursed approximately $859 by Medicaid and $2,148 by Medicare.

30.     On November 20, 2018, the defendant CARLO GARCIA, together with others, caused 10 "superbills" purporting to describe the occupational therapy services provided

---

³     For example, the defendant CARLO GARCIA billed for five 15-minute timed units of Timed OT Services purportedly provided on December 19, 2017, to patient "L.Y.," an individual whose identity is known to your affiant.  Specifically, GARCIA billed for two units of CPT code 97112 (Neuromuscular Reeducation), two units of CPT code 97110 (Therapeutic Exercise) and one unit of CPT code 97140 (Manual Therapy).  Accordingly, if GARCIA had performed an average of 15 minutes of timed one-on-one services, he would have provided approximately one hour and 15 minutes of one-on-one care to IS.  Even assuming that GARCIA provided the minimum amount of timed services permissible according to Medicare, he would have provided at least 68 minutes of one-on-one care.  See supra ¶ 16.  GARCIA, together with others, billed Medicaid a total of $280 for the purported hour and 15 minutes of Timed OT Services, and Medicaid paid $120.47.

by GARCIA from November 9, 2018 to November 18, 2018 to be emailed to COMPANY-1. The November 20, 2018 email included a superbill for occupational therapy services purportedly provided by GARCIA to 28 patients on November 12, 2018. The "superbill" for all 28 of the patients stated that they had purportedly received at least five units of Timed OT Services. Assuming that GARCIA provided all of the Timed OT Services for an average of 15 minutes per unit, GARCIA purportedly provided over 32 hours of one-on-one Timed OT Services on November 12, 2018. That estimate does not include additional occupational services that were included on the "superbill", but for which Medicare and Medicaid do not require a set amount of one-on-one treatment time, such as Initial Evaluations and Reevaluations or Self-Care lessons. GARCIA, together with others, ultimately billed Medicare approximately $4,300 and Medicaid approximately $2,200 for occupational therapy services that he purportedly provided on November 12, 2018, and was reimbursed approximately $1,541 by Medicare and $948 by Medicaid.

31. On April 30, 2019, the defendant CARLO GARCIA, together with others, caused 6 "superbills" purporting to describe the occupational therapy services provided by GARCIA from April 23, 2019 to April 28, 2019 to be emailed to COMPANY-1. The April 30, 2019 email included a superbill for occupational therapy services purportedly provided by GARCIA to 23 patients on April 24, 2019. The "superbill" for all 23 of the patients stated that they had purportedly received at least four or five units of Timed OT Services. Assuming that GARCIA provided all of the Timed OT Services for an average of 15 minutes per unit, GARCIA purportedly provided over 25 hours of one-on-one Timed OT Services on April 24, 2019. That estimate does not include additional occupational services that were included on the "superbill", but for which Medicare and Medicaid do not require a set amount of one-on-one treatment time,

such as Initial Evaluations and Reevaluations or Self-Care lessons.  GARCIA, together with others, ultimately billed Medicare approximately $1,800 and Medicaid approximately $1,640 for occupational therapy services that he purportedly provided on April 24, 2019, and was reimbursed approximately $803 by Medicare and $606 by Medicaid.

32.	On May 14, 2019, the defendant CARLO GARCIA, together with others, caused 9 "superbills" purporting to describe the occupational therapy services provided by GARCIA from April 29, 2019 to May 7, 2019 to be emailed to COMPANY-1.  The May 14, 2019 email included a "superbill" for occupational therapy services purportedly provided by GARCIA to 26 patients on April 30, 2019.  The "superbill" for all 26 of the patients stated that they had purportedly received at least four or five units of Timed OT Services.  Assuming that GARCIA provided all of the Timed OT Services for an average of 15 minutes per unit, GARCIA purportedly provided over 28 hours of one-on-one Timed OT Services on April 30, 2019.  That estimate does not include additional occupational therapy services that were included on the "superbill", but for which Medicare and Medicaid do not require a set amount of one-on-one treatment time.  GARCIA, together with others, ultimately billed Medicare approximately $2,280 and Medicaid approximately $3,800 for occupational therapy services that he purportedly provided on April 30, 2019, and was reimbursed approximately $1,040 by Medicare and $949 by Medicaid.

33.	On September 22, 2019, the defendant CARLO GARCIA, together with others, caused 10 "superbills" purporting to describe occupational therapy services provided by GARCIA from September 9, 2019 to September 18, 2019 to be emailed to COMPANY-1.  The September 22, 2019 email included a "superbill" for occupational therapy services purportedly provided by GARCIA to 22 patients on September 9, 2019.  The "superbill" for all 22 of the

patients stated that the patients had purportedly received at least four or five units of Timed OT Services. Assuming that GARCIA provided all of the Timed OT Services for an average of 15 minutes per unit, GARCIA purportedly provided 24 hours of one-on-one Timed OT Services on September 9, 2019. That estimate does not include additional occupational therapy services that were included on the "superbill", but for which Medicare does not require a set amount of one-on-one treatment time. GARCIA, together with others, ultimately billed Medicare approximately $1,980 and Medicaid approximately $4,070 for occupational therapy services that he purportedly provided on September 9, 2019, and was reimbursed approximately $969 by Medicare and $1,702 by Medicaid.

34. Based on the investigation to date, other than during vacation coverage, the defendant CARLO GARCIA, CG OT and CNS did not employ another licensed occupational therapist in addition to GARCIA from 2015 to 2021.

35. Moreover, as set forth above in ¶ 17, Medicare, Medicaid and New York state regulations do not allow the provision of occupational therapy services by individuals other than by licensed Occupational Therapists, or by Occupational Therapist Assistants and students seeking licensure under the direct supervision of a licensed Occupational Therapist. Accordingly, it would have been impossible for the defendant CARLO GARCIA and CG OT to have provided more than 24 hours of direct one-on-one Timed OT Services by a licensed occupational therapist in a single day.

36. Additionally, INDIVIDUAL-1, an aide to the defendant CARLO GARCIA whose identity is known to your affiant, told law enforcement in a voluntary interview that GARCIA directed unlicensed aides to provide services to patients, including exercises, ultrasound, grass-stones, paraffin wax treatments and physical stretching.

37. Similarly, CS-1 told law enforcement in a voluntary interview that the defendant CARLO GARCIA directed him/her to prepare patient billing sheets. CS-1 stated that GARCIA directed to fill out the billing sheets by following a "cheat sheet" that identified the CPT codes and units that each insurer would reimburse. CS-1 stated that GARCIA directed him/her to fill in occupational therapy services and units on the "cheat sheet" regardless of whether the patient actually received the services or received Timed OT Services for the stated amount of times. CS-1 stated that he/she heard GARCIA telling an employee that the codes had the "highest reimbursement rates from insurance."

38. Accordingly, the defendant CARLO GARCIA, together with others, caused Medicare, Medicaid and private insurers to be fraudulently billed for occupational therapy services purportedly provided on at least December 19, 2017, November 12, 2018, April 24, 2019, April 30, 2019, and September 9, 2019.

II.  Fraudulent Billing for Services Not Provided to a Confidential Source

39. Between September 22, 2020 and November 7, 2020, another confidential source ("CS-2"), under the supervision of special agents with HHS-OIG and the FBI, went to CNS's offices on approximately eleven occasions to receive physical therapy services.[4] The CS's visits were recorded (the "Recorded Visits"). After each visit, the CS-2 spoke with law enforcement agents and described the CS-2's experiences at CNS. CS-2's visits to CNS established that false and fraudulent claims for occupational therapy services purportedly

---

[4] CS-2 has pled guilty to money laundering pursuant to a cooperation agreement. CS-2 is currently cooperating in hopes of receiving leniency at sentencing (and has not yet been sentenced). CS-2 has provided reliable information in the course of this investigation. CS-2's information has been corroborated by other evidence obtained during the course of this investigation, including, but not limited to, the consensual audio and video recordings the CS has made.

provided to CS-2 were submitted for reimbursement by Medicaid through a managed care organization ("INSURANCE COMPANY-1"), whose identity is known to your affiant.

40. Although CS-2 visited CNS's offices to receive physical therapy services, the defendant CARLO GARCIA, together with others, caused claims to be submitted to INSURANCE COMPANY-1 for occupational therapy services purportedly provided to CS-2 for at least seven dates that CS-2 did not visit CNS: October 9, 11, 17, 20, 24, 26 and 31, 2020. Nonetheless, GARCIA, together with others, caused the submission of fraudulent bills to Medicaid for occupational therapy services never provided to CS-2, including the Timed OT Services. In total, GARCIA, together with others, caused the submission of bills for a total of 28 units of occupational therapy services purportedly provided to CS-2 on the seven days for $2,180 and receiving $1,087.54.

41. In addition, Medicare and Medicaid permitted only licensed Physical Therapists, Physical Therapist Assistants, Occupational Therapists and Occupational Therapist Assistants (collectively, "Licensed Professionals") to provide reimbursable physical therapy and occupational therapy treatments to beneficiaries. Despite the defendant CARLO GARCIA, CG OT and CNS billing Medicaid for treating CS-2 on 17 separate dates, CS-2 was actually treated by Licensed Professionals on only two occasions – on September 22, 2020, when a licensed physical therapist, Tae Jung Kim, performed an initial evaluation, and on October 27, 2020, when GARCIA gave CS-2 a hand massage. Instead, CS-2 was treated by other CNS staff members, who were not licensed to provide physical therapy or occupational therapy services. As a result, the treatments billed were not performed by Licensed Professionals trained and authorized to perform physical therapy and occupational therapy services, and GARCIA and CNS fraudulently sought reimbursement for those treatments.

III. <u>Fraudulent Billing for Services Contradicted By CNS's Security Camera Recordings</u>

42. On May 28, 2021, the Honorable Lois Bloom, United States Magistrate Judge for the Eastern District of New York, issued a search warrant for CNS's offices. Pursuant to that search warrant, law enforcement agents seized CNS's internal security camera recordings. Those recordings reflect that the defendant CARLO GARCIA, together with others, submitted and caused to be submitted false and fraudulent claims for reimbursement for services that were not eligible for Medicare and Medicaid reimbursement, were not provided as billed, and/or were not provided.

43. For example, the internal security camera recordings show that on April 18, 2021, the defendant CARLO GARCIA was only present at CNS for approximately two hours. Nonetheless, GARCIA, together with others, caused a "superbill" to be emailed to COMPANY-1 falsely claiming that he had provided approximately six and a half hours of one-on-one Timed OT Services on April 18, 2021. Accordingly, GARCIA, together with others, caused Medicare, Medicaid and private insurers to be fraudulently billed for occupational therapy services purportedly provided on April 18, 2021.

CONCLUSION

44. Based on the facts set forth in this affidavit, there is probable cause to believe that the defendant CARLO GARCIA, together with others, submitted and caused the submission of false and fraudulent claims for reimbursement for services that were not eligible for Medicare and Medicaid reimbursement, were not provided as billed, and/or were not provided, in violation of Title 18, United States Code, Section 1347.

45. WHEREFORE, I respectfully request that the Court issue a warrant for the arrest of the defendant CARLO GARCIA so that he may be brought before the Court and dealt with according to law.

17

46.     IT IS FURTHER RESPECTFULLY REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant complaint and application and related arrest warrant. The defendant CARLO GARCIA is currently at liberty, and it is respectfully submitted that sealing these documents is necessary to prevent the defendant from avoiding arrest and prosecution.

_____
NADEEM AFZAL
Special Agent, HHS-OIG

Sworn to before me by telephone this
23rd day of June, 2023

_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| United States of America | ) |
|---|---|
| v. | ) |
|  | ) Case No. 23-MJ-596 |
| CARLO ELOMINA GARCIA, | ) |
|  | ) |
|  | ) |
| *Defendant* | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     CARLO ELOMINA GARCIA,     ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☑ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

Violations of Title 18, United States Code, Sections 1347, 2 and 3551 et seq.

Date:     06/23/2023

*Cheryl Pollak*
*Issuing officer's signature*

City and state:     Brooklyn, New York     Hon. Cheryl L. Pollak, Magistrate Judge, E.D.N.Y.
*Printed name and title*

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

*Arresting officer's signature*

*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____  Weight: _____

Sex: _____  Race: _____

Hair: _____  Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____